CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

OCT 04 2016

JULIA C. DUDLEY CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

ROGER SCHWEIKERT
on behalf of himself and others similarly situated,
    Plaintiff,

    v.

Civil No. 3:16CV00072

MARK R. HERRING
in his official capacity as
Attorney General of the Commonwealth of Virginia,

JAMES B. ALCORN, in his official capacity as
Chairman of the Virginia State Board of Elections,

CLARA BELLE WHEELER, in her official capacity as
Vice Chairman of the Virginia State Board of Elections,

SINGLETON McALLISTER, in her official capacity as
Secretary of the Virginia State Board of Elections, and

EDGARDO CORTEZ, in his official capacity as
Commissioner of the Virginia Department of Elections,
    Defendants.

## VERIFIED CLASS ACTION COMPLAINT
## FOR EMERGENCY INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff Roger Schweikert, on behalf of himself and all others similar situated,

with an outline of the Class Action Complaint provided as Exhibit J, alleges as follows:

### Nature of the Action

1. The First Amendment to the United States Constitution guarantees Citizens the

right to vote their conscience, free from government compulsion, when participating in the

equitable selection of their district and state presidential electors. Nonetheless, Virginia

law acts to strip them of that right, imposing a discriminatory system that disenfranchises a class

and regions of voters, who vote for, but are denied, an elector to represent their preference as to

who is to serve as president. That law cannot be sustained under the First Amendment or as a

legitimate exercise of Virginia's authority under this Constitution for the United States.

2. Roger Schweikert, now as "only" a Virginia qualified voter of the fifth district of Virginia where the Representative in the first Congress of the United States was James Madison, father of this Constitution for the United States of America, who has written on the issue of equitable representation of voters in the presidential elector process; yet in the past, Plaintiff Schweikert, as both a qualified voter and the injured elector candidate of the fifth district of Virginia for the Republican Party's national candidate in 2012, brings this action on behalf of himself and other qualified voters, and elector candidates, of any party, past, present, or future, to obtain emergency injunctive relief that allows all Virginia qualified voters to vote their consciences in their precinct and district General Election free from the injury or the threat of being disenfranchised by the law of Virginia that forces non-equitable dilution of his or her vote for presidential elector by non-qualified and qualified voters of other districts of the Commonwealth of Virginia.

3. This legal action was in part inspired by, and follows the form of, one by citizen and delegate to the 2016 Republican National Convention, Carroll Boston Correll, Jr., who was plaintiff in Case 3:16-cv-00467-REP in the United States District Court Eastern District of Virginia, Richmond Division filed on June 24, 2016. On July 11, 2016, Senior United States District Judge Robert E. Payne issued an Order of Permanent Injunction stating: "thereupon it is hereby ORDERED that the Defendants, their officers, agents, servants, employees, attorneys, and any other persons in active concert or participation with any of them, be, and the same hereby are, permanently enjoined from enforcing against Carroll Boston Correll, Jr. the provisions of Va. Code § 24.2-545(D).

It is so ORDERED."

A similar ORDER is requested to enjoin Va. Code § 24.2-202 & 203 for Virginia voters.

## Jurisdiction and Venue

4. This action arises under the First, Twelfth, Fourteenth, Fifteenth and Seventeenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the doctrine recognized in *Ex Parte Young*, 209 U.S. 123 (1908); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Jurisdiction of the Court is conferred by 28 U.S.C. § 1331 Federal question and § 1343 Civil rights and elective franchise because the Plaintiff's elective franchise civil rights claims arise under this Constitution for the United States of America and its ratified amendments.

5. The United States District Court for the Western District of Virginia is a proper federal venue for this action under 28 U.S.C. § 1391(b)(1) because all the Defendants are residents of Virginia and the Plaintiff resides in the Western District of Virginia.

## Parties

6. Plaintiff Roger Schweikert ("Schweikert"), was an elector candidate from the Fifth Congressional District of Virginia in the 2012 General Election for President. He resides in Ruckersville, Virginia, and is a registered, qualified voter. Schweikert was selected as the Republican elector for the Fifth Congressional District in 2012, and has participated in campaigns for federal, statewide, and local Republican candidates.

7. Defendant Mark R. Herring is the Attorney General of the Commonwealth of Virginia. He is responsible, inter alia, for defending the constitutionality of Virginia legislative enactments. He is named in his official capacity,

8. Defendants James B. Alcorn, Clara Belle Wheeler and Singleton McAllister are the Chairman, Vice Chairman and Secretary, respectively, of the Virginia State Board of Elections ("the Board"). They are charged with the responsibility to "make rules and

regulations and issue instructions...to promote the proper administration of election laws," and "may petition a circuit court or the Supreme Court, whichever is appropriate, for a writ of mandamus or prohibition, or other available legal relief, for the purpose of ensuring that elections are conducted as provided by law." Va. Code § 24.2-103. They are named in their official capacities. Plaintiff Schweikert considers as a friend the Defendant Clara Belle Wheeler, the Republican minority member of the Virginia State Board of Elections, but her vote is overwhelmed by the two Democrat members who are also named Defendants, and all are named not in their personal, but in official capacity.

9. Defendant Edgardo Cortez is the Commissioner of the Virginia Department of Elections, which is an agency of the Commonwealth of Virginia that is charged with the responsibility to conduct the Board's operations and discharge the Board's duties, consistent with delegated authority. Mr. Cortez is named in his official capacity.

### Facts

10. The "father of this Constitution" James Madison of Montpelier was the first man elected to serve as a Representative from the 5th District of Virginia in the United States Congress. Plaintiff Schweikert of Ruckersville, an Elector candidate for the 5th District of Virginia in the 2012 general election for President, in a 19 July 2016 letter written to the Virginia Supreme Court quotes the congress.gov website Constitution Annotated, in its section on Presidential Electors, that refers to Madison:

> *"The district system was largely considered the most equitable, and Madison wrote that it was that system which was contemplated by the framers of the Constitution."* [1]

In the equitable, district Elector system, every voter in America votes for 3 Electors.

---

[1] https://www.congress.gov/content/conan/pdf/GPO-CONAN-REV-2014-9-3.pdf

11.     Somewhat Madison's mentor, Vice President Thomas Jefferson on 12 January 1800, wrote to James Monroe, then Governor of Virginia (1799 - 1802):

> *"On the subject of an election by a general ticket, **or by districts**, most persons here seem to have made up their minds.  **All agree that an election by districts would be best,...** "*

Less than 14 months later, at his Inauguration, President Jefferson said:

> *These principles form the bright constellation which has gone before us and guided our steps through an age of revolution and reformation.* ***The wisdom of our sages and blood of our heroes have been devoted to their attainment.*** *They should be the creed of our political faith, the text of civic instruction, the touchstone by which to try the services of those we trust: and **should we wander from them in moments of error or of alarm, let us hasten to retrace our steps and to regain the road which alone leads to peace, liberty, and safety.**[2]*

We as a nation wandered from the wise way of district vote for Electors when "Winner Take All" became the path to power for a few, party bosses, over the general population. Now is the time for all good men to retrace our steps to regain the road of equal representation for every American voter in every state in their vote for the President by Electors, each qualified voter votes for three Electors, one by district, two by state.

12.     In a 23 August 1823, a year before the Election of 1824, where none of the four candidates achieved a majority of the Elector votes, so using the Twelfth Amendment, the House elected John Quincy Adams (1825-1829) as President over Andrew Jackson (1829-1837).  In a letter to George Hay, Son in Law of then President James Monroe (1817-1825), former President James Madison (1809 - 1817) wrote:

[George Hay was nominated in July 1825 by President John Quincy Adams as a Judge in the Eastern District of Virginia, and confirmed by the Senate in March 1826.]

---

[2] Thomas Jefferson, "First Inaugural Address," published in Richardson, 1:312.

*I agree entirely with you in thinking that the election of Presidential Electors by districts,* is **an amendment very proper to be brought forward** *at the same time with that relating to the eventual choice of President by the H. of Reps.*

**The district mode was mostly, if not exclusively in view when the Constitution was framed and adopted;**

*& was exchanged for the general ticket & the legislative election, as the only expedient for baffling the policy of the particular States which had set the example.*

*A constitutional establishment of that mode will doubtless aid in reconciling the smaller States to the other change which they will regard as a concession on their part.*

*And it may not be without a value in another important respect. The States when voting for President by general tickets or by their Legislatures, are a string of beads;*

**when they make their elections by districts, some of these differing in sentiment from others,**

**and sympathizing with that of districts in other States, they are so knit together as to break the force of those geographical and other noxious parties which might render the repulsive too strong**

*for the cohesive tendencies within the Political System.*

*It may be* **worthy of consideration whether in requiring elections by districts,** *a discretion might not be conveniently left with* **the States to allot two members to a single district.**[3]

**[Note: The Maine & Nebraska Plan makes the state "one district" where every qualified voter votes for the two "Senate linked" Electors. Virginia also designates 2 At-Large Electors & 11 Electors who reside in their districts.]**

While possibly a "case of first impression", Madison's *"an amendment very proper to be brought forward"* is already in the 14th Amendment clause, "**No state shall make or enforce any law** which shall abridge the privileges or immunities of citizens of the United States;… **nor deny to any person within its jurisdiction the equal protection of the laws.**" Where states have laws that require or impose "Winner Take All", minority qualified voters are disenfranchised in districts when their votes are diluted by voters in other districts, and low population state voters are disenfranchised by large state voters.

---

[3] http://press-pubs.uchicago.edu/founders/documents/a2_1_2-3s10.html J. Madison to G. Hay

13. A bit over a year after the Election of 1824, where none of the four candidates achieved a majority of the Elector votes, so the House elected one of its own, John Quincy Adams as President, Madison wrote on 30 January 1826 to Robert Taylor:[4]

> *An election by Districts,* *instead of general tickets, & State Legislatures, and an avoidance of a decision by the House of Representatives voting by States,* *would certainly be changes much for the better:* *and a combination of them, may be made perhaps acceptable both to the large and to the small States.*

Again, possibly a "case of first impression", Madison's stated goal of *"An election by Districts, instead of general tickets, …would certainly be changes much for the better:"* is already in the 17th Amendment, Second Sentence,

> "The **electors** in each State **shall have the qualifications requisite** for electors of the most numerous branch of the State legislatures."

What are the requisite qualifications? Age, Length of Citizenship, and Residence. State House legislators in most or all states **must reside in and be elected by the qualified voters who reside in the district from which elected to serve,** that is not elected in whole or in part by voters from other districts in the state. Thus, it is **fair to interpret that a district presidential elector must be elected by only the qualified voters of the district the elector represents.** Reasonably, **the 17th Amendment changed both the way States could elect Senators, and the way States could elect Electors.**

Why might the 17th Amendment of 1913 have contained in the law words with a requirement for "electors"? Recall that the Election of 1912 the incumbent Republican President, William Howard Taft, was challenged by former Republican President Theodore Roosevelt, who lost the nomination so created the "Progressive Party", or "Bull Moose Party". Then Roosevelt gained 88 Elector votes on 4,119,207 popular votes to only 8 Elector votes for Taft on 3,483,922, to Democrat Wilson with 6,293,454 votes and 435 Elector votes, possibly the largest loss ever by an incumbent President.

---

[4] https://www.loc.gov/item/mjm019729/ or
http://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-02-02-02-0616

Case 3:16-cv-00072-NKM   Document 1   Filed 10/04/16   Page 7 of 45   Pageid#: 7

Yet how is a Federal Judge to interpret one sentence in one amendment, the Seventeenth, the second sentence, **"The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."** that has been "overlooked" for over a century?

First, the Federal Rules of Civil Procedure[5], Committee Notes on Rules—2007 Amendment, addresses in modern context the word "shall", yet what was the context of the word "shall" in 1913? If it means "must", why for over a century has it been ignored?

The restyled rules minimize the use of inherently ambiguous words. For example, **the word "shall" can mean "must," "may," or something else, depending on context.** The potential for confusion is exacerbated by **the fact that "shall" is no longer generally used in spoken or clearly written English**. The restyled rules replace "shall" with "must," "may," or "should," depending on which one the context and established interpretation make correct in each rule.

A 1950 scholarly paper from College of William and Mary Law School, "Factors Influencing Judges in Interpreting Statutes" may be of assistance[6]. In part it reads,

Any existing evils would be a good and traditional background for determining the meaning of Congress. It would certainly be difficult to justify an interpretation based upon the idea that Congress intended to foster the evils. **At this point the onus must be placed on draftsmanship.** If Congress has not made its position clear, **evils necessarily are a proper source for the discovery of meaning.**

The "evil" of the 1912 Election "Elector" outcome could be a clue to its inclusion.

In a 2013 Northwestern University Law Review article [7] is written:

ABSTRACT-Nearly a century ago, the Seventeenth Amendment to the U.S. Constitution worked a substantial change in American

---

[5] https://www.law.cornell.edu/rules/frcp/rule_1

[6] Phelps, Arthur W., "Factors Influencing Judges in Interpreting Statutes" (1950). Faculty Publications. Paper 809. h p://scholarship.law.wm.edu/facpubs/809

[7] Zachary D. Clopton & Steven E. Art, THE MEANING OF THE SEVENTEENTH AMENDMENT AND A CENTURY OF STATE DEFIANCE, Northwestern University Law Review Vol. 107, No. 3 (2013), p. 1181

government, dictating that the people should elect their senators by popular vote. Despite its significance, there has been little written about what the Amendment means or how it works.

This law review comments upon very little legal scholarship into the 17th Amendment, yet a key sentence introduces a shocking summary paragraph[8]:

"It may be surprising, then, that the states repeatedly and blatantly violate the Constitution when it comes to how they fill vacancies in the Senate.

Since the adoption of the Seventeenth Amendment, there have been 244 vacancies in the U.S. Senate." (from its Appendix A) "Data were collected about every vacancy to determine: how each vacancy occurred; whether it was filled by an appointee, an elected replacement, both, or no one at all; the time it took the state to first fill the vacant seat; and the time that the people were left without elected representation during each vacancy. **These data show that the states have violated the Seventeenth Amendment's command that vacancies are to be filled by election in almost one-sixth of all vacancies since 1913, and the frequency of defiance has only increased during that time.** Further, even when the states hold elections to fill Senate vacancies, they do not always do so in an expeditious manner. **In total, the people have lost out on nearly 200 years of elected representation since 1913,** during which time Senate seats were left empty or filled by unelected appointees. **These data are out of step with the Seventeenth Amendment's focus on popular enfranchisement."**

If states have blatantly violated the obvious Senate election provision of the Seventeenth Amendment, then why would anyone be surprised that the states have violated the "invisible" or overlooked second sentence provision relating to "requisite qualifications" of electors?  Election of "electors" by district voters revokes any state's "Winner Take All" laws, that potentially has a greater impact on party power politics than the direct election of Senators, that is the primary focus of the Seventeenth Amendment. Yet this very thorough law review article fails to write a word on the second sentence.

———————————————

[8] Ibid, p. 1187

The closest the authors come to addressing the Second Sentence of the Seventeenth Amendment, is in the discussion of the word "shall"[9]:

> …"shall" introduces duties in the Constitution it is mandatory in nature."[79] The word appears five times in the Seventeenth Amendment alone, including in the requirement that "[t]he Senate of the United States shall be composed of two Senators from each State."

> [NOTE: Again, the authors fail to address "shall" in the Second Sentence.]

> Footnote [79:] The original Constitution uses the word 191 times; too many times to reproduce here. A review leaves no doubt that the word conveys unconditional commands in the Constitution: "The judicial Power of the United States, shall be vested in one supreme Court," U.S. CONST. art. III, §1, meaning that the core of the judicial power cannot be shared, Stern v. Marshall, 131 S. Ct. 2594, 2608-09 (2011). The Supremacy Clause provides that the Constitution, federal law, and treaties "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby," U.S. CONST. art. VI, cl. 2, a mandatory command.
> **The amendments to the Constitution use "shall" 115 times - the only amendment that does not use the word is the Tenth. Each time the duty imposed is obligatory.**
>
> **"The electors in each State SHALL have the qualifications requisite for electors of the most numerous branch of the State legislatures."**

14. The "architect of this Constitution", George Washington of Mount Vernon was the first man elected by "presidential electors" to serve as the President of the United States, beginning in 1789. In his 1796 Farewell Address, Washington warned:

> *"…resist with care the spirit of innovation upon its principles, however specious the pretexts. One method of assault may be to effect, in the forms of the Constitution, alterations which will impair the energy of the system, and thus to undermine what cannot be directly overthrown."*

---

[9] Ibid, p. 1202

15.  Beyond Washington's warning against the "Spirit of Innovation" that can undermine what it does not directly overthrow, Washington warned of the "Spirit of Party", with geographical discriminations to lift up unjust dominion, the warnings merge in the change from the Framers' Vision of the district system, to a statewide system, for election of presidential electors, done without explicit act of change by a Constitutional amendment, (or since 1913, even by ignoring a provision of the 17th Amendment):

> *One of the expedients of party to acquire influence within particular districts is to misrepresent the opinions and aims of other districts...*

> *The basis of our political systems is the right of the people to make and to alter their constitutions of government.* ***But the Constitution which at any time exists, till changed by an explicit and authentic act of the whole people****, is sacredly obligatory upon all.*

> *They serve to organize faction,* ***to give it an artificial and extraordinary force; to put, in the place of the delegated will of the nation the will of a party****, often* ***a small but artful and enterprising minority*** *of the community; and, according to the alternate triumphs of different parties,* ***to make the public administration the mirror of the ill-concerted and incongruous projects of faction****, rather than the organ of consistent and wholesome plans digested by common counsels and modified by mutual interests.*

> *However combinations or associations of the above description may now and then answer popular ends,* ***they are likely, in the course of time and things, to become potent engines, by which cunning, ambitious, and unprincipled men will be enabled to subvert the power of the people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion.***

> ***I have already intimated to you the danger of parties in the State, with particular reference to the founding of them on geographical discriminations****.*

> *Let me now take a more comprehensive view, and* ***warn you in the most solemn manner against the baneful effects of the spirit of party generally.***[10]

The baneful effects of the spirit of party are exemplified in the Winner Take All method.

---

[10] http://gwpapers.virginia.edu/documents_gw/farewell/transcript.html

16.     Under Virginia law § 24.2-203, electors for president of the United States of America may be selected by a state convention of a political party, with party as defined in § 24.2-101,

> "Party" or "political party" means an organization of citizens of the Commonwealth which, at either of the two preceding statewide general elections, received at least 10 percent of the total vote cast for any statewide office filled in that election. The organization shall have a state central committee and an office of elected state chairman which have been continually in existence for the six months preceding the filing of a nominee for any office.

or electors may be selected as in § 24.2-543 (A):

> "A group of qualified voters, not constituting a political party as defined in §24.2-101, may have the names of electors selected by them, including **one elector residing in each congressional district** and **two from the Commonwealth at large**, printed upon the official ballot to be used in the election of electors for President and Vice President by filing a petition pursuant to this section.

So, there are two methods for selecting or electing electors for President and Vice President, by state party or by state petition, as there are two methods, state party convention or state primary election, for the designation of delegates to the party's national convention to choose the party's nominees for President and Vice President of the United States, per Va. Code § 24.2-545 (A).

17.   In both cases, of presidential delegates and presidential electors, the designated persons are **bound to vote** for the party's, or the independent petition's, named candidates for President and Vice President, not vote their conscience. Such "lock step" voting, contrary to conscience, was not the vision of the Framers of this Constitution for the electors for the President, and so by "trickle down" philosophy, would not be for delegates to a convention to select a Party's nominee for President.

18. Wisely, Judge Payne issued a Permanent Injunction Order in the Correll case against such violation of conscience, being bound to vote for a candidate, as a feature of a law of Virginia.

19.     The key point in the Correll Complaint of 2016 could be the legal point:

"14. Those delegates are not free to vote their conscience."

Penalties are defined for a delegate who does not vote as bound to vote, as in his point:

"15. Violations of Section 545(D) are Class 1 misdemeanors subject to prosecution and criminal punishment. Va. Code § 24.2-1017; Va. Code § 24.2-1001. Under Virginia law, a Class 1 misdemeanor is subject to "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." Va. Code § 18.2-11(a)."

20.     The next twenty points in the Correll Complaint of 2016 address his particular situation, as part of a class of citizens similarly situated, regarding being bound to vote for the winner of the Presidential Primary of the Republican Party, and subsequent party rules for its national convention, part of Va. Code § 24.2-545.

21.     At this point, this Plaintiff Schweikert Complaint parts from the facts and laws specific to the matter of presidential delegates to those for presidential electors, and laws of Virginia in Code sections § 24.2-202 and § 24.2-203, that violate the spirit of this Constitution in the Framers' Vision, and violate the intent of later law.

22.     The two primary framers of this Constitution were Madison and Washington. They based their plans on study of many confederacies in Europe and the Republic of Venice from books collected by Jefferson, then the minister to France, crated and shipped to Madison. In their "Virginia Plan", or Randolph Plan, named for Virginia's then current governor Edmund Randolph, later Washington's first Attorney

General, there was only one house in the legislative branch, to be apportioned by population of the various states. That population based vote in a "Congress" was an huge difference from the Articles of Confederation where each state had an equal vote.

23. The critical key to the progress of the Constitution at its Convention in Philadelphia in the summer of 1787, and its subsequent ratification, was what is known as the "Great Compromise", or often better known as the "Connecticut Compromise" offered by Roger Sherman of Connecticut That "Great Compromise" protected the rights of the small states from the power of the large states in this new government under "this Constitution for the United States of America". During the ratification, Washington wrote, *"permit me to say, that a greater Drama is now acting on this Theatre than has heretofore been brought on the American Stage, or any other in the world.*[11]

24. In contrast to the noble, uplifting, world changing drama of men like Washington. Jefferson, & Madison, post World War II has given birth to the "Theater of the Absurd". In his 1965 book, *Absurd Drama*, critic Martin Esslin wrote:

> "The Theatre of the Absurd attacks the comfortable certainties of religious or political orthodoxy.
> It aims to shock its audience out of complacency, to bring it face to face with the harsh facts of the human situation as these writers see it. …The shedding of easy solutions, of comforting illusions, may be painful, but it leaves behind it a sense of freedom and relief.
> And that is why. in the last resort, the Theatre of the Absurd does not provoke tears of despair but the laughter of liberation."[12]

When on stage it may evoke a nervous laughter, but when the Theater of the Absurd describes the American stage of electing a President, it is a Tragedy, not Comedy.

---

[11] http://founders.archives.gov/GEWN-04-06-02-0436 Washington to Newenham, 29 August 1788

[12] https://en.wikipedia.org/wiki/Theatre_of_the_Absurd

25.    The Great Compromise that enabled this Constitution for the United States of America to come into being, had features in both Article I, in the Legislative branch, and Article II, in the Executive branch.  Most students and Constitutional Law professors are aware of its provisions in the Legislature, Article. I., Section. 1.:

> "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Section. 2 defines the requirements for Representatives, who are apportioned by population of the states, elected by qualified voters of the district that House member represents.  Section. 3. defines the requirements for Senators, who are assigned two Senators for each state, elected by all the state's voters, each Senator with one vote.

26.    But in respect for state sovereignty, the method of selection or election of Senators by each state was NOT defined by the Framers of this Constitution.  Likewise, the method of selection or election of a state's Presidential Electors, not by the Popular Vote at the General Election nation-wide, was NOT defined by the Framers of this Constitution.  As Madison wrote after the second House election of president in 1824:

> *An election by Districts,* *instead of general tickets, & State Legislatures, and an avoidance of a decision by the House of Representatives voting by States,* *would certainly be changes much for the better.*[13]

The overlooked second sentence of the Seventeenth Amendment of 1913 does this.

27.    Yet few students, or college history professors, or even law school instructors of Constitutional Law, are fully aware of the provisions of the Great Compromise in Article. II. on the Executive branch.  The compromise provisions also impact the presidential elector system, each state receives two Elector votes, one for each of its two senators, as well as one vote for each representative based on the population of the state.  With eleven elected servants as Representatives in Congress

---

[13] http://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-02-02-02-0616

districts and two elected servants as Senators, Virginia receives thirteen (13) Electors to vote for President of the U.S.[14]. Equitably, each district voter in America votes for 3 Electors, not 13 Electors in Virginia, or 38 Electors in Texas, or 55 Electors in California.

28. Further, the Great Compromise protection of the small state interests from being overwhelmed by the large state interests is also written into the Executive branch by the alternate method of election of the president, by vote of the newly elected House of Representatives, where each state, no matter its population, and thus, no matter its total number of electors, receives one vote in the House vote for president,[15] most likely determined by the majority of the delegation of the state by party, which is a parallel concept to each state having an equal number of votes, two (2), in the Senate. In the alternate method of electing the President when no candidate receives a majority of the Electors, the Vice President of the United States, who serves as the President of the Senate, is logically elected by the members of the newly elected Senate.

29. However, by an **alteration of the Presidential Elector system**, from election of Electors by voters of a district to an election by state-wide voters, described by the framers as the *"general ticket"* system of a "slate" of electors, now called a "winner take all" system, has over the many years, corrupted the equitable logic of the Presidential Elector system, and has grossly undermined the originally very wise Elector system, that once gave power to the majority while protecting the minority and its voice.

30. The flip side of that coin is that **the power of party bosses is much increased in the "Winner Take All" current system.** Sometimes Party Bosses are

---

[14] Constitution, Article. II. Section. 1, paragraph 2.

[15] Constitution, Article. II. Section. 1, paragraph 3, amended by Amendment Twelve, ratified June 15, 1804.

unaccountable. Often Party Bosses are chosen or elected by only party activists, "moneyed interests" or "big donors", and not elected by common citizens. **Washington warned against the "Spirit of Party",** a term that could include all these dangers. Prior to World War I, in a speech in Chicago on 22 June 1913, former President Theodore Roosevelt, who lost in 1912, and months after the 17th Amendment became law, said:

> *"No people is wholly civilized where a distinction is drawn between stealing an office and stealing a purse."* [16]

The "Winner Take All" system that has come to dominate American politics beginning shortly after the death of Washington makes much easier the process of stealing an office, that then leads to the office holder stealing from the purse of the the taxpayer.

31.    How so? How have alterations undermined the wisdom of the Presidential Elector system, and created on our American electoral stage a Theater of the Absurd? Let us use the concept of logic called *Reductio ad absurdum*, or "Reduce to the Absurd". Contrary to the Framers' Vision, the current method of states (except for Maine and Nebraska) assigning Presidential Electors by a "Winner Take All" method is ABSURD, when logically analyzed to its potential endpoint. From Wiki:

> Reductio ad absurdum (Latin: "reduction to absurdity"; pl.: reductiones ad absurdum), also known as argumentum ad absurdum (Latin: "argument to absurdity", pl.: argumenta ad absurdum), is a common form of argument which seeks to demonstrate that a statement is true by showing that a false, untenable, or absurd result follows from its denial,…
>
> …**or in turn to demonstrate that a statement is false by showing that a false, untenable, or absurd result follows from its acceptance.**
>
> First recognized and studied in classical Greek philosophy (the Latin term derives from the Greek ἐις ἀτοπον ἀπαγωγή or eis atopon apagoge, "reduction to the impossible", for example in Aristotle's Prior Analytics), this technique has

---

[16]  The Encarta Book of Quotations, page 802

been used throughout history in both formal mathematical and philosophical reasoning, as well as informal debate.

32. Because the "Winner Take All" system requires only a PLURALITY, not a Majority, let us take an hypothetical example of THREE roughly equal popularity candidates for President. In the General Election one candidate receives 34 per cent of the vote in the TOP 12 population states, CA, TX, FL, NY, IL, MI, OH, PA, NJ, GA, NC, VA. The other two take 33 per cent of the vote in those top 12 population states. Next consider that the 34 per cent "winner" receives NOT a SINGLE VOTE in the OTHER 38 STATES, that the other two split the vote in those states, having more Popular Votes.

In the current Winner Take All system, **despite not winning a single vote in 38 of 50 States, that 34 per cent winner in the 12 most populous states, "a handful of states", would become the President with 277 Electoral Votes.**

Attorney and American Historian Tara Ross wrote in her 2004 book, reprinted in 2012, Enlightened Democracy: The Case for the Electoral College, seen in Chapter Two, "An American Balancing Act", in the Section "A Republic, If You Can Keep It", as Ben Franklin famously described this Constitution, starting on page 40:

> "The **Founders** buttressed the new government with one more protective device: The Electoral College. The new presidential election system provided at least two reasonable concessions to the minority. **First, a presidential candidate cannot be elected simply by gaining a majority in a handful of states. Instead, the presidential candidate must garner support across the nation to have a reasonable probability of being elected.** Second, the minority is provided with several methods by which it may amplify its voice, allowing it to make a statement that would otherwise go unnoticed in a direct popular vote."[17]

Of course that extreme example of the potential of the current "General ticket" or "Winner Take All" Elector Vote method is absurd, and worse, *is contrary to the vision of*

---

[17] Enlightened Democracy: The Case for the Electoral College, p.40-41

*the Founders that a candidate could not be elected simply by gaining a majority in a handful of states* (12 of 50) as described by attorney Tara Ross above, but how far is America today from that absurd extreme example?  America is 91 per cent toward that extreme!

33.     So how is America 91 per cent toward that absurd extreme?  Larry Sabato of the University of Virginia Center on Politics in early 2015 said that whoever is the Democrat candidate for President STARTS with 247 electoral votes of the 270 votes needed to win the required majority.

34.     So, ***Reductio ad absurdum, Part II***, is how a grade school government instructor explained the current Presidential Elector system to his students, and Plaintiff Schweikert recalled the **school yard limerick, about the race between "Willy Makeit" and "Betty Wont"**..  Compare "Willy" and "Betty" in the "race" for President to running the 100 yard dash, where Betty Wont is spotted at the 80 yard line with Willy Makeit at the zero yard line, at the starting line, when the starting pistol is fired.

Actually **if you "run the numbers" on a calculator, it is even worse, because to divide 247 by 270 is like Betty being spotted on the 91 yard line**, whereas Willy is at the Starting line when the starting pistol is fired!  **Will he make it?  Bet he won't!**  Such is both bad sport, and bad politics.

35.     The WINNER TAKE ALL system is ABSURD.  The Framers would reject such an "innovation" and alteration that concentrates power in the hands of state "Party Bosses".  President Washington warned in his Farewell Address against the Spirit of Innovation, and against the Spirit of Party. The Winner Take All is an absurd violation of both 1796 warnings of Washington !  The Framers did not give us an absurd system. The Elector system envisioned by the Framers is both wise and fair, a system where Electors were elected by the qualified voters in the district in which the Elector resides.

36.     A bit less absurd in description, but just as outrageous or absurd in action, is a "Comparative Analysis" of impact of qualified voters in various states.  With the "Winner Take All" system in Virginia, a qualified voter in effect gets to vote 13 times for President, one time for each Elector assigned for the two Senators, and one for each of eleven (11) Representatives apportioned to Virginia.  A qualified voter in nearby Delaware in effect, gets to vote for President 3 times, once for each of the two Senators assigned to the state, and one Elector for the one Representative as apportioned in the U.S. House of Representatives.  That means that a qualified voter in Virginia is over 4 times more powerful than a qualified voter in the smallest state geographically, Delaware, and over 4 times more powerful than a qualified voter in the largest state geographically, Alaska, and 4 times more powerful than a qualified voter in Montana, North Dakota, South Dakota, Wyoming, or Vermont.  Or over all, a Virginia qualified voter is more powerful than a voter in 38 other states with lower total population.

37.  Less than one fourth as powerful as a voter are voters of seven states (23.08 per cent) than is the Virginia qualified voter.  However, a Virginia qualified voter is less than one fourth as powerful as a qualified voter in California, 13 divided by 55 equals 23.63 per cent.  But think how much "less equal" is a qualified voter in Delaware or Alaska than a qualified voter in California, 3 divided by 55 equals 5.45 per cent as powerful.  In 1966, the Attorney General of Delaware David Buckson wrote in a Federal Court Complaint against other states:

> "7. **In every election the state unit system abridges the political rights of substantial numbers of persons by arbitrarily awarding all of the electoral votes of their state to the candidate receiving the bare plurality of its popular votes.  …**"

"12. The state unit-vote system therefore causes the national electoral vote to be so unrelated to the popular vote that it **unreasonably burdens the efforts of citizens of different states to join in concerted political activity to bring about the election of a person of their mutual choice, a right reserved to them by the Ninth and Tenth Amendments to the Constitution.** The votes for state winners are combined nationally on an exaggerated basis while the votes for state losers are isolated within their states and excluded from the national count. This national distortion of the effects of individual votes both abridges the right to engage in national political activity and **denies the Plaintiff's citizens due process of law in violation of the Fifth and Fourteenth Amendments. It also denies them equal protection of the laws and abridges citizens' privileges of voting for national officers in violation of the Fourteenth Amendment.** This interstate wrong also violates principles of equity enforceable in actions between states."

38.     In the Election of 1824, where the House, as the final judge of the integrity of election results under this Constitution, did not accept any of the 15 Elector votes of North Carolina, because of questions of the integrity of the state vote count, the House then exercised the alternate method of election of the president, by House vote.

39.     In that 1824 election, none of the four candidates for president received the required majority of Electoral votes. That lack of majority of Elector votes was the case with or without the 15 North Carolina electoral votes being disqualified. With those 15 votes disqualified, Jackson and Adams tied with 84 electoral votes. Even with NC's votes properly allocated, Jackson needed 132 electoral votes to win as president. In the House vote, it voted for one of the top three vote getting candidates, per this Constitution and the 12th Amendment. The House voted to elect one of its own, House member John Quincy Adams, who was second in the popular and elector votes.

40.     In the close race of 1876, the states' delegations were split 19 to 19 Democrat to Republican, leading to the Compromise of 1877, rather than a House vote,

whereby Republican Rutherford B. Hayes was selected to be President by an Election Commission, made up of seven members, four Republicans and three Democrats.

41.     In the close race of 1960, Nixon v. Kennedy, where the questioned state election results in Illinois and Texas ostensibly gave Kennedy the required Electoral vote majority, many national Republican leaders suggested challenging the election results. But Nixon was a keen political calculator, he knew the majority of states were Democrat majority delegations, so Kennedy likely would have won in a House vote; so Nixon did not contest the election results, so not to be labeled by voters as a "sore loser".

42.     In the close race of 2000, Bush v. Gore, the majority of the states were Republican majority delegations, so likely Bush would have won in a House vote, if like the House did in North Carolina in 1824, the House disqualified the Electoral votes of Florida due to questionable vote results, and then did its Constitutional duty to vote and elect the President, since no candidate achieved a majority of Electors.

43.     In the 2000 election, the 25 electoral votes in Florida determined if Bush won with 271 or lost with 246, or Gore lost with 266, or won with 291 if one accepts the current system of "Winner Take All" of its 25 electoral votes, contrary to the Framers' vision of district voters voting for their Elector who lived in and represented the will of the majority of voters of that district, not the will of the entire state's voters.

44.     However, if the Congressional District plan as used in Maine and Nebraska were done ALSO, ONLY in Florida, not all 50 states, one would subtract 25 from Bush's 271 total, but add 15 to match the 15 Congressional districts that voted for a Republican Representative, for 261 total, short of the 270 goal  The Democrats in 2000 won 8 Congressional districts, and say if the Democrats received the two "Senate

electors" for winning the plurality of the state wide popular vote in the General Election, that would be 10 Electoral votes added to the 266, for a 276 total, a win for Gore.

45. However, if the Framers vision of district election of electors were honored all across America, in 2000 Bush would have likely won a majority of the Electoral votes, as deduced from a House report on outcomes of races for Congress, nation wide.[18]

46. Further, if the U.S. Supreme Court had respected this Constitution's Separation of Powers, and so more wisely than it did, simply declined to hear the case of *Bush v. Gore*, saying that the proper resolution of the political question before the nation was best resolved by honoring the forward thinking provisions of the Framers, written into this Constitution, as altered by the Twelfth Amendment in 1804, that would have properly resulted in the election of Bush by a House vote, without U.S. Supreme Court involvement, without crossing the boundaries of Separation of Powers.

47. And in the close race of 2012, Obama v. Romney, the majority of the states were Republican majority delegations. If the Framers' vision were honored, with presidential electors elected by only the voters of the district in which they resided, rather than all the voters statewide, as is the common habit of most states' dangerous innovation of the presidential elector system, Romney would have won 274 to 264[19].

48. The above few elections "what if" examples reveal how close is the split in the American voting population between candidates for President. George Mason in debate in the Constitution Convention believed that in 19 of 20 presidential elections the popular votes would be so close no candidate would have a majority of electors, so that

---

[18] http://clerk.house.gov/member_info/electionInfo/2000election.pdf

[19]  http://www.270towin.com/alternative-electoral-college-allocation-methods/ Select CDP (ME & NE) option.

the Congress (as originally debated the Senate) vote for President would determinate the outcome.[20]  The next day, (September 6), James Wilson, suggested the House select the president, that in time was modified by Connecticut's Roger Sherman with the "Great Compromise" concept of equal vote for each state, each state getting one vote. Mason liked the idea of the House vote rather than vote by the "aristocratic" Senate.

49.     This historic closeness of the General Election popular vote and thereby the electoral vote split was confirmed by the two elections after the unanimous elections of George Washington as president in 1789 and 1792.  In 1796, the split Electoral vote of Maryland, with 8 for John Adams and 5 for Thomas Jefferson gave the presidency to Adams.  In 1800, Thomas Jefferson and Aaron Burr tied with 73 Electoral votes, with John Adams close behind at 65.  Despite a letter from Aaron Burr to members of the U.S. House of Representatives that he entered the race thinking he would serve as Vice President with President Thomas Jefferson, after 35 rounds of voting in the House, Jefferson was eventually elected by the House as the third President.

50.     That problem of tie elector results led to the passage of the Twelfth Amendment to avoid future ties in the electoral vote.  However, over the years, that perceived problem was avoided in future elections by a two non-Constitutional "innovations" by state "party bosses" (NOT changed by a Constitutional Amendment), one, state legislation of the assignment of a state's Electoral votes, with the "unit rule", or "state slate" voting, today called "winner take all", an innovation contrary to the equitable district vote system for elector votes envisioned by Madison and other Framers of this Constitution, and two, Party Primary Election or Convention systems.

---

[20] George Mason, Forgotten Founder, by Jeff Broadwater, page 199.

Case 3:16-cv-00072-NKM   Document 1   Filed 10/04/16   Page 24 of 45   Pageid#: 24

51.     In 2012, the presidential race in Virginia was decided by 149,298 votes statewide, but there were many Citizens' reports in Arlington and Fairfax, and other large population counties, of electronic election theft favoring the Democrat candidate for president, amounting to 147,000 "extra" votes in just Fairfax and Arlington, with 84 and 87 per cent "Voter Participation Rates" when the normal rate is 72 to 76 per cent. Several investigative reporters, such as Bev Harris with "Black Box Voting: Ballot-tampering in the 21st Century", and Jonathan D. Simon, "CODE RED: Computerized Election Theft and the New American Century, Post-E2014 Edition", and others have published detailed studies about how voting results are being stolen in election after election by electronic voting systems. The clever, easier to conceal, vote theft of a few dozen or a few hundred votes less for Candidate R and a few hundred votes more for Candidate D in precinct after precinct, yields tens or even hundreds of thousands of stolen votes over an entire county or several counties, with massive rewards by the absurd currently in vogue "Winner Take All" state-wide popular vote for all Elector votes.

52.  The Framers' vision of the equitable and rational method of district electors selected or elected by the voting residents of only the district they served greatly reduces the incentive for election theft, for the size of the lucrative prize for theft is reduced from as much as 55 in California to 1 in each district, or from 13 to 1 in Virginia in each district. The current "extra-Constitutional" or un-Constitutional system rewards Party bosses, or even "hackers" who benefit from electronically stealing an election.

53.     Plaintiff Schweikert was a Republican presidential elector candidate in 2012 prepared to serve and represent the largely rural "geographic discrimination", to use the words of Washington in his Farewell Address. Voter Schweikert and over a 51 per cent majority of his fellow voters of the 5th district of Virginia in 2012, and if no

injunction is ordered, may again be injured and disenfranchised in 2016 by vote dilution by the large population county "extra" voters, that are not resident qualified voters in the 5th district, contrary to the 17th Amendment second sentence.

 Those "extra" votes negate the vote of the residents of their 5th district due to the un-Constitutional provisions of Virginia Code section § 24.2-202 primarily, and also § 24.2-203, Virginia laws that violate the Federal principle of "equal protection of the laws" contained in the 14th Amendment.

Plaintiff Schweikert, an Elector candidate in 2012 injured by an un-Constitutional Virginia law, is a fitting representative for many other presidential elector candidates in 2012 and previous elections in Virginia, and others who are very likely to be disenfranchised in the 2016 election in Virginia, caused by Virginia Code section §24.2-202 primarily, and also §24.2-203, if no injunction is ordered.

## Class Allegations

54. Schweikert brings this action on his own behalf and pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of the Class of all Virginia electors for the 2016 Republican Party, Democratic Party, Libertarian Party, Green Party, or Independent petition Elector candidates.

55. The Class consists of 11 of 13 Republican, Democrat, Libertarian, Green, or other electors. Joinder of so many parties is impractical due to their numerosity, as well as the need to obtain relief in a relative short order of time, before the national elections, and later state meeting of the Electors to vote for President, so that Class members' rights can be vindicated in a meaningful fashion.  The two (2) Electors related to the two

(2) Senators are properly elected by the qualified voters of the entire state, so are not part of the class of Electors properly elected by only the qualified voters of the district.

56. This case involves only questions of law common to all Class members—specifically regarding the lawfulness of Section § 24.2-202—and no questions of fact unique to any Class member. In short, every Class member faces precisely the same legal injury based on the same threatened application of the same statutory provision.

57. For that reason, Schweikert's claims are typical of those of other Class members, making him an appropriate representative of the Class. Indeed, his claims are identical to those of other Class members, and are not antagonistic to those of any Class member, as the relief sought herein would not prevent any Class member from voting for any candidate.

58. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

59. Schweikert, or his counsel will fairly and adequately protect the interests of absent class members. There are no conflicts between Schweikert's claims and those of absent Class members that would make Class certification inappropriate. Plaintiff will vigorously assert the claims of all Class members.

### Count I:
### Section § 24.2-202 the Freedom of Speech Protected
### by the First and Fourteenth Amendment

60. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

61. The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, protects the right to free speech, including political speech.

62. An individual's vote for a presidential elector at a general election, and electors in their session, constitutes political speech protected by the First Amendment.

63. Section 202 abridges that right by stripping voters of their freedom to vote their conscience in their district when selecting a presidential elector and mandating that the elector vote for a particular party's candidate.

64. Violation of Section 202 is subject to criminal prosecution and punishment under Virginia law.[21]

65. Section 202 is not narrowly tailored and is unsupported by any compelling government interest.

66. Section 202 therefore violates the First and Fourteenth Amendments.

### Count II:
### Section 202 Violates the Freedom of Association Protected by the First and Fourteenth Amendment

67. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

68. The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, protects the right to freedom of association, including for political purposes.

69. Participating in a precinct vote for district representative to vote for president as an elector is an exercise of the right to freedom of association by the "geographical discriminations" as described by Washington in his Farewell Address, precinct and district voting is a "neighborly" association protected by the First Amendment, applied to

---

[21] Code of Virginia Chapter 10. Election Offenses Generally; Penalties § 24.2-1001. Willful neglect or corrupt conduct. or § 24.2-1015. Conspiracy against rights of citizens under this title.

Case 3:16-cv-00072-NKM   Document 1   Filed 10/04/16   Page 28 of 45   Pageid#: 28

states by the Fourteenth Amendment, so protects the right to freedom of association, including association for political purposes.

70. Section 202 abridges that right by stripping electors from their association with the voters of the district they theoretically represent, and further, at the meeting of electors, Section 203 strips the electors of their freedom to vote their conscience, when selecting a presidential by mandating that they vote for a particular candidate.

71. Violation of Section 202 or 203 is subject to criminal prosecution and punishment under Virginia law.

72. Section 202 is not narrowly tailored and is unsupported by any compelling government interest.

73 .Section 202 therefore violates the First and Fourteenth Amendments.

### Count III:
### Sections 202 & 203 Exceed Virginia's Authority Under this Constitution

74. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

75. This Constitution for the United States of America preempts the States from regulating in certain areas that implicate exclusively federal interests.

76. "The States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates." *Cousins v. Wigoda*, 419 U.S. 477,489-90 (1975).

77. Sections 202 and 203 exceed the powers retained by the Commonwealth of Virginia under this Constitution for the United States of America.

78. Accordingly, Sections 202 and 203 are preempted by this Constitution for the United States of America and cannot be lawfully enforced.

## Count IV:
## Section 203 Violates the Right To Vote

79. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

80. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

81. By dictating for whom electors must vote, Section 203 violates the right to vote protected the Fourteenth Amendment.


## Count V:
## Declaratory Judgment Pursuant to 28 U.S.C. SS 2201 and 2202

82. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

83. An actual controversy exists between Defendants and Plaintiff regarding the constitutionality of Section 202 and 203.

84. Plaintiff, on behalf of himself and Class members, is entitled to a declaration of rights under this Constitution for the United States of America and any further necessary or proper relief against Defendants pursuant to 28 U.S.C. §2201 and §2202.

## Count VI:
## Temporary, Preliminary, and Permanent Injunctive Relief

85. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

86. Plaintiffs' and Class members' First and Fourteenth Amendment rights are well established under case law of the Supreme Court and courts of appeals. See, e.g., *Kusper v. Pontikes*, 414 U.S. 51 (1973); *Cousins v. Wigoda*, 419 U.S. 477 (1975); *United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981); *Eu v. San Francisco*

*Democratic Central Committee*, 489 U.S. 214 (1989). Accordingly, Plaintiff has a strong likelihood of success on the merits of this action.

87. Plaintiff and other Class members will imminently suffer irreparable injury as a result of Defendants' application and enforcement of Section 202 to restrict Plaintiff and Class members from fully and freely exercising their core constitutional rights of political speech and association at a time of urgent need. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *El-rod v. Burns,* 427 U.S. 347, 373 (1976).

88. Defendants will suffer no injury at all if they are enjoined from enforcing Sec tons 202 and 203. Enforcement of that provision does not further public safety or any other substantial interest of the Commonwealth of Virginia.

89. An injunction would serve the public interest, as the public interest favors the exercise of First Amendment rights and is not harmed by the injunction of government action that is likely unconstitutional. *ACLU of Ill v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012).

## Count VII:
## Section 203 Violates the Right To Vote

90. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

91. Plaintiffs' and Class members' First and Twelfth Amendment rights are established under this Constitution. Accordingly, Plaintiff has a strong likelihood of success on the merits of this action.

92. The wording of the Twelfth Amendment includes the words:

**"The Electors shall meet in their respective states, and vote by ballot for President and Vice President…and they shall make distinct lists of all persons**

voted for President, **and** all persons voted for as Vice-President, **and the** number of votes for each,..."

93. The wording of Virginia Code § 24.2-203. includes the words:

"**Electors selected by the state convention** of any political party as defined in § 24.2-101 **shall be required to vote** for the nominees of the national convention to which the state convention elects delegates. **Electors named in any petition** of qualified voters as provided in § 24.2-543 **shall be required to vote** for the persons named for President and for Vice President in the petition.

94. The wording of Virginia Code § 24.2-203 precludes multiple persons being voted on by the Electors, or distinct lists of all persons voted for President and all persons voted for Vice President, or the number of votes for each, because the Electors shall be required to vote for only one slate of a President and Vice President, contrary to this Constitution and its Twelfth Amendment.

95. Plaintiff and other Class members will imminently suffer irreparable injury as a result of Defendants' application and enforcement of Section 202 to restrict Plaintiff and Class members from fully and freely exercising their core constitutional rights of political speech and association at a time of urgent need. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *El-rod v. Burns,* 427 U.S. 347, 373 (1976).

96. Defendants will suffer no injury at all if they are enjoined from enforcing Sections 202 and 203. Enforcement of that provision does not further public safety or any other substantial interest of the Commonwealth of Virginia.

97. An injunction would serve the public interest, as the public interest favors the exercise of First Amendment rights and is not harmed by the injunction of government

action that is likely unconstitutional. _ACLU of Ill v. Alvarez_, 679 F.3d 583, 589-90 (7th Cir. 2012).

**Count VIII:**
**Section 202 Violates the Right To Vote**

98. Plaintiff repeats and re-alleges the allegations of Paragraphs 1-59.

99. Plaintiffs' and Class members' First and Seventeenth Amendment rights are established under this Constitution. Accordingly, Plaintiff has a strong likelihood of success on the merits of this action.

100. The wording of the Seventeenth Amendment includes the words:

> **"The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."**

Compare the wording of this Constitution Article I, Section 3:

> **"The Senate of the United States shall be composed of two Senators from each State, [chosen by the Legislature thereof,], for six years; and each Senator shall have one vote.**
> **Immediately after hey shall be assembled in Consequence of there first Election, they shall be divided as equally as may be into three Classes...."**

Note the wording of "electors" is NOT in this Constitution Article I, Section 3.

101. The wording of Virginia Code § 24.2-202. includes the words:

> "The **qualified voters** of the Commonwealth shall choose the Commonwealth's electors for President and Vice President of the United States at the general election in November 1996, and every fourth year thereafter. **Each voter shall vote for a number of electors which equals the whole number of senators and representatives** to which the Commonwealth at that time is entitled in the Congress of the United States."

Case 3:16-cv-00072-NKM   Document 1   Filed 10/04/16   Page 33 of 45   Pageid#: 33

"Qualified Voter" is defined differently than "Registered Voter". **Qualified Voter requires Residence, both domicile and place of abode, per the § 24.2-101 definitions.** Thus, by extension, **a "qualified voter" of the 8th or 10th district is not a qualified voter of the 5th district where Plaintiff Schweikert was disenfranchised** as a Presidential Elector by the "aggregate" counting of those out of 5th district votes.

102.  In much the same way that a qualified voter votes for TWO Senators and ONE Representative to represent the voters' interests in the Legislative branch known as the Congress, per the vision of the Framers, the qualified voter is to vote for Three Electors, TWO, one for each of their state's two U.S. Senators in Congress, and ONE for their district Representative in Congress, the Electors to represent the voters' interests in the Executive branch, by the Electors vote for the President & Vice President.

Three votes total in the Legislative Branch, Three votes total in the Executive Branch; by legislators in the Senate and House, by electors in the "Electoral College". It is a simple, balanced, and fair system, for ALL American voters, no matter what state.

103.  To have voters from the entire state overwhelm the votes of the voters of a single district is contrary to the Great Compromise to protect small from large, critical to the construction and the ratification of this Constitution for the United States of America.

104.  In 1892, Michigan embraced a district based Elector system, but with the two Senate related Electors, one elected by resident qualified voters of the eastern part of the state, and one elected by the resident qualified voters of the western part of the state.  (A plan this Plaintiff sees as unwise, and not in keeping with "equal protection",

for then a Michigan voter in a district would vote for only two Electors total, not three.)

The Supreme Court in *McPherson v. Blacker* *146 U.S. 1 (1892)*, stated, in part:

> Under the second clause of Article II of the Constitution, the legislatures of the **several states have exclusive power to direct the manner in which the electors of President and Vice President shall be appointed**.
>
> Such appointment **may be made by the legislatures directly**, or **by popular vote in districts**, or **by general ticket**, as may be provided by the legislature.
>
> If the terms of the clause left the question of power in doubt, contemporaneous and continuous subsequent practical construction has determined the question as above stated.
>
> **The second clause of Article II of the Constitution was not amended by the Fourteenth and Fifteenth Amendments**, and they do not limit the power of appointment to the particular manner pursued at the time of the adoption of these amendments or **secure to every male inhabitant of a state, being a citizen of the United States, the right from the time of his majority to vote for presidential electors**.

And *McPherson* was raised in the Florida supreme Court in the *Bush v. Gore* case in December 2000.[22] The McPherson case of 1892 is almost "prophetic" to the movement for the 17th Amendment, ratified on 8 April 1913, in its Second Sentence, and for the 19th Amendment ratified on 18 August 1920 adding the right to vote for women.

The Seventeenth Amendment changed the method of selection or election of United States Senators, to a direct election by the qualified voters of the state. The Framers in 1787 had left to the states to determine how both Senators and Presidential Electors were to be selected or elected. Different states used a variety of different methods for selecting Senators and Electors, including some that used Direct Election in the General Election by the qualified voters of that state. Yet after the Election of

---

[22] http://articles.philly.com/2000-12-05/news/25578391_1_electors-oral-arguments-federal-courts

Jackson as president in 1828, most states moved to "Unit Rule", "State Slate", or "Winner Take All", statewide popular voting for electing Electors.

Everyone concedes that the Seventeenth Amendment removed the states' options on what method the state was allowed to use to select or elect its United States Senators as shown in its first paragraph:

> **The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years, and each Senator shall have one vote.** The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

Yet, law school professors and most Constitution scholars have seemingly overlooked the application and significance of the second sentence of the Seventeenth Amendment, that is an additional set of words, not parallel wording to the Constitution:

> The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

A United States Representative elected to serve in the U. S. Congress need only live in the state of his election, not in the district. However, the "electors of the most numerous branch of the State legislators.", in different states called different names - Delegate, or Representative, or Assemblyman, have an additional **"qualification requisite"** for their service in the State legislature, that is the elected legislative servant must live in, and be elected by, the qualified voters of that district, NOT by the qualified voters state-wide.

Therefore, the second sentence of the 17th Amendment requires that a Presidential Elector be elected by the qualified voters of the district in which the Elector resides, for the Elector related to the District's Representative in Congress, (NOT all qualified voters of the state), and like each Senator is a state resident elected state-wide

36 of 55

by the Popular vote, the two Senate-related Electors are state residents elected "At Large" by all the voters of the state. At the meeting of Electors (often called the Electoral College, but never described that way in this Constitution for the United States of America), the district **Electors represent the interests of the majority of the voters of the district of their residence, not the statewide dictates of the Party Bosses.**

105. The system imposed by Virginia Code § 24.2-202 could be interpreted to be in direct opposition to the wise words of the man, George Washington, whose statue graces the Rotunda of the Virginia Capitol, designed by Thomas Jefferson:

> *One of the expedients of party to acquire influence within particular districts is to misrepresent the opinions and aims of other districts…*

Statewide voting for a "State Slate" of Electors misrepresents the votes of one district, or many single districts, being overwhelmed by the votes of another district or a few. Washington warned of divisions of East versus West, city versus country,

> *I have already intimated to you the danger of parties in the State, with particular reference to the founding of them on geographical discriminations…*

106. Specifically, Virginia Code § 24.2-202 causes vote dilution of the qualified voters of a singular Elector district, by the multiple member "At-large" system for Elector voting. *Escambia County v. McMillan*, 466 U.S. 48 (1984), states in part:

> Appellees, black voters of Escambia County, Fla., filed suit in the District Court, **alleging that the at-large system for electing the five members** of the Board of County Commissioners **violated appellees' rights under the First, Thirteenth, Fourteenth, and Fifteenth Amendments**, the Civil Rights Act of 1957, 71 Stat. 637, as amended, 42 U.S.C. § 1971(a)(1), and the **Voting Rights Act of 1965**, 79 Stat. 437, as amended, 42 U.S.C. § 1973. [Footnote 1] **Appellees contended that the at-large system**

**operated to "dilute" their voting strength.** *See, e.g., Rogers v. Lodge,* 458 U. S. 613, 458 U. S. 616-617 (1982).[23]

In *Thornburg v. Gingles* (1986), the supreme Court used the term "vote dilution through submergence" to describe claims that a jurisdiction's use of an at-large/ multimember election system or gerrymandered redistricting plan diluted minority votes. Elector "Winner Take All" plans are tantamount to "vote dilution through submergence".

In short, in jurisdictions with elected "at-large", multiple member representatives, the qualified voters in some areas have their vote diluted as compared to qualified voters who are represented by an elected servant from a single member district. This is the same Vote Dilution concern as Section 2 of the Voting Rights Act of 1965. Court decisions allow at-large districts, but the majority of "seats" in that representative body must be elected from single member districts. That concept of single member districts should apply to the elected servants who serve as Presidential electors, as well.

In Virginia, a qualified voter would vote for THREE Electors, (NOT 13), one who lives in and represents the same district as the voters, and two who live anywhere in the Commonwealth of Virginia, who ostensibly are linked to the U.S. Senators who are elected statewide. Likewise, in California, a qualified voter would vote for THREE Electors, (NOT 55), and a qualified voter in Delaware would vote for THREE Electors (as Delaware has one U.S. Representative and two Senators in Congress.)

107. On 29 March 1961, the 23rd Amendment was ratified, giving the District of Columbia equal Elector vote representation as the State of Delaware, as well as equal to Alaska, Nevada, Vermont, and Wyoming. The Voting Rights Act of 1965 was signed

---

[23] https://supreme.justia.com/cases/federal/us/466/48/case.html

Case 3:16-cv-00072-NKM   Document 1   Filed 10/04/16   Page 38 of 45   Pageid#: 38

into law on 6 August 1965.  Section 2 prohibits two types of discrimination: "vote denial",

in which a person is denied the opportunity to cast a ballot or to have their vote properly

counted, **and "vote dilution", in which the strength or effectiveness of a person's**

**vote is diminished.  Most Section 2 litigation has concerned vote dilution**,

especially claims that a jurisdiction's redistricting plan or use of at-large/multimember

elections prevents minority voters from casting sufficient votes to elect their preferred

candidates.[24]  An at-large election can dilute the votes cast by minority voters by

allowing a cohesive majority group to win every legislative seat in the jurisdiction.[25]

In October 1966, in Federal Court, Delaware as *parens patrae* sued New York

and other large population states whose "Winner Take All" innovation of the Presidential

Elector system, not implemented with an Amendment to this Constitution, effectively

made the vote of a Delaware voter FAR LESS valuable (vote dilution) voting for a total

of three (3) electors than the vote of a New York voter, when New York was then the

most populous state with 43 Electoral Votes.  The Delaware Complaint, filed by Attorney

General David P. Buckson, about 14 months after the Voting Rights Act stated,in part:

> "**7.  In every election the state unit system abridges the political rights of**
> **substantial numbers of persons by arbitrarily awarding all of the electoral**
> **votes of their state to the candidate receiving the bare plurality of its popular**
> **votes.**  This occurs without regard to the number of votes cast for the opponent.
> 435 of the total of 538 electoral votes correspond to Representatives and are
> allocated to states because of their numbers of persons.  Nonetheless the state unit
> system frequently allows all of the state's votes to be case for a candidate opposed
> by as many as 49% of its voters.  **Votes cast for the losing candidate within a**

---

[24] Tokaji, Daniel P. (2006). "The New Vote Denial: Where Election Reform Meets the Voting Rights Act".
*South Carolina Law Review.* **57**. Retrieved November 11, 2013.

[25] Adams, Ross J. (1989). "Whose Vote Counts? Minority Vote Dilution and Election Rights". *Journal of
Urban and Contemporary Law.* **35**. Retrieved March 26, 2015.

particular state are not only discarded at an intermediate stage of the elective process but effectively treated as if they had been cast for an opponent. The barest popular vote plurality and the overwhelming landslide are converted alike into a unanimous state vote in the national election. **This arbitrary misappropriation of the elective power of substantial political minorities denies them due process of law and equal protection of the laws in violation of the Fourteenth Amendment."**

"9. On a national basis, **the state unit system's cancellation of states' minority votes causes inequities and distortions among citizens of the several states** by arbitrarily isolating the effects of votes case by persons of a particular political persuasion or party in one state from those cast by voters of the same persuasion in other states. Chance and accident produce distorted and inequitable results when the state units are combined in the national electoral totals. This is illustrated by the distorted effects of the popular votes cast for the Republican and Democratic candidates in the adjoining units of Illinois and Indiana in the 1960 election…In the adjoining states of Virginia and Maryland, voters who supported Kennedy suffered a similar fate:… Again, the unit-votes by states converted a two-state popular vote minority into a sizable electoral vote majority."

"12. The state unit-vote system therefore causes the national electoral vote to be so unrelated to the popular vote that it **unreasonably burdens the efforts of citizens of different states to join in concerted political activity to bring about the election of a person of their mutual choice, a right reserved to them by the Ninth and Tenth Amendments to the Constitution.** The votes for state winners are combined nationally on an exaggerated basis while the votes for state losers are isolated within their states and excluded from the national count. This national distortion of the effects of individual votes both abridges the right to engage in national political activity and **denies the Plaintiff's citizens due process of law in violation of the Fifth and Fourteenth Amendments. It also denies them equal protection of the laws and abridges citizens' privileges of voting for national officers in violation of the Fourteenth Amendment.** This interstate wrong also violates principles of equity enforceable in actions between states."

This is even more the reality today, fifty years later, in 2016, with the dominance of California as the most populous state with 55 Electoral Votes. This imbalance in

Federal vote impact between voters of various states could be seen as a violation of the 5th, 9th, 10th, 15th, 17th Amendments, and the 14th with its equal application of federal laws on all states. As the 12th most populous state, this Virginia law violates the Equal Right to Vote for Federal elected servants to the qualified voter Citizens of 38 other smaller population states under this Constitution for the United States of America.

108. One beneficiary of this inequitable "Winner Take All" electoral vote alteration to the vision of the Framers of this Constitution, President John F. Kennedy once wrote:

> *The great enemy of truth is very often not the lie, but the myth, persistent, persuasive, and unrealistic."*

If not quite a lie, the pervasive belief among common citizens and even most scholars, possibly fostered by the self-interest of the political consultant class, that the "Winner Take All" system used by 48 of 50 states is the "way it has always been", and even, "the way the Constitution dictates", is clearly a myth, if one reads the wise words of the Framers presented earlier in this document. The "Winner Take All" system, "General ticket" or "Unit Rule" system is a great enemy of Truth.

109. The wording of Virginia Code § 24.2-202 precludes voters of a district voting for an Elector who is representative of the majority of the voters of that district, as contrasted to vote dilution by election by the voters of the entire state, a majority, or even plurality, to then vote for President and Vice President; with Electors to vote the preference of the majority of the voters of that district, (or vote their conscience, especially if new information is learned about a candidate after the General Election), as opposed to being bound to vote for the Party boss dictated "State Slate" list of Electors who are likewise bound to vote for the Party boss dictated candidates, contrary to this Constitution and its Seventeenth Amendment.

110. The man whose immensely valuable example can still wisely guide this nation and whose immensely valuable Houdon statue stands tall and humbly proud in the center of the rotunda of the Jefferson designed Virginia Capitol, George Washington, also wrote in his Farewell Address[26]:

*...I have already intimated to you the danger of parties in the State, with particular reference to the founding of them on geographical discriminations.*
*... sooner or later the chief of some prevailing faction, more able or more fortunate than his competitors, turns this disposition to the purposes of his own elevation, on the ruins of public liberty.*

111. Plaintiff and other Class members will risk the ruin of public liberty in the future, and imminently suffer irreparable injury as a result of Defendants' application and enforcement of Section 202 to restrict Plaintiff and Class members from fully and freely exercising their core constitutional rights of political speech and association at a time of urgent need.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." _El-rod v. Burns_, 427 U.S. 347, 373 (1976).

112. Employees of the Defendants who are members of the Virginia State Board of Elections, appear to be deceptive or negligent in response to qualified voter citizen's questions about the Elector system in Virginia. An email response dated August 19, 2016 at 11:06 AM by an SBE attorney to an aide to Plaintiff Schweikert, falsely stated:

This is in response to your FOIA request of August 6, 2016. Having reviewed our records it appears that we are no longer the custodian of the information you are requesting. Documents containing information about presidential electors from past presidential elections are permanently archived with the Library of Virginia. You will need to contact them in order to retrieve the requested records. No party or

---

[26] http://www.loc.gov/rr/program/bib/ourdocs/farewell.html

other group has yet qualified to be on the ballot in November 2016. As such, we have no list of qualified presidential electors for the upcoming election.

Sincerely,

*Brooks C. Braun, Esq.*

Policy Analyst
Virginia Department of Elections

A legal researcher for the Plaintiff discovered on Wikipedia a list of the 2012 Electors, and while further researching the residence addresses per elector district to determine if each was in compliance with the district residence requirement of the 17th Amendment, when searching for Edna N. Frady, found the SBE website that posts a document that "proves the lie" of the above email from SBE attorney Braun (also see Exhibit B):

https://elections.virginia.gov/Files/CastYourBallot/CandidateList/2012-

OfficialPresidentialNovemberGeneralElectionCandidateList.pdf

Direct search of the above URL sometimes yields the following Error message, that may suggest electronic "blocking" of some citizens from access to public information, yet another violation by Virginia of the 14th Amendment "equal protection of the laws":

**Error**
Breadcrumb NavXT 5.0.1 Virginia Department of Elections > Error
Search Elections
Due to unforeseen circumstances we are unable to process your request at this time. If you have any questions or concerns please contact us.

Further, the 2016 list of Presidential Electors has been withheld by the Virginia SBE, but upon repeated request, a collection of scanned forms of Elector candidates, some annotated "NOT REGISTERED", were provided on 26 September 2016 by email.

113.    In short, this Class Action complaint presents the Right to Equal Protection of the Laws between voters of states provided by the Fourteenth Amendment, and is likely a "case of first impression", as it presents the overlooked, not yet enforced 17th Amendment requirement of being elected only by the resident qualified voters of the district the Elector represents, not by the resident qualified voters of the entire state.

114.    Defendants will suffer no injury at all if they are enjoined from enforcing Sections 202 and 203.  Enforcement of those provisions does not further public safety or any other substantial interest of the Commonwealth of Virginia.

115. An injunction would serve the public interest, as the public interest favors the exercise of First Amendment rights, protected between the states by the Fourteenth Amendment, and is not harmed by the injunction of state government law that is likely unconstitutional. *ACLU of Ill v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012).

### Prayer for Relief

Plaintiff Roger Schweikert, respectfully requests that the Court grant the following relief:

a) A temporary restraining order or preliminary injunction, entered prior to November 1, 2016, enjoining Defendants, their agents, officers, employees, successors, and all persons acting in concert with each or any of them from implementing, enforcing, or giving any effect to Sections 202 and 203 of Title 24.2 of the Virginia Code;

b) An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

c) An order declaring that Sections 202 and 203 of Title 24.2 of the Virginia Code to be facially unconstitutional and entering judgment for Plaintiff and members of the Class;

d) A permanent injunction enjoining Defendants, their agents, officers, employees, successors, and all persons acting in concert with each or any of them from implementing, enforcing, or giving any effect to Sections 202 and 203 of Title 24.2 of the Virginia Code;

e) Costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or any applicable statute or authority; and

f) Such other relief as this Court determines is just and proper.

Dated: October 3, 2016

Respectfully submitted,

*Roger R. Schweikert*

Roger Schweikert
6209 Spring Hill Road
Ruckersville, Virginia 22968
434-990-9094
*Plaintiff, Pro Se, Representative for
Proposed Class  (seeking attorney)*

## **Verification**

I hereby state under penalty of perjury that the foregoing complaint is true and correct to the best of my knowledge and belief.

Executed on this 4th day of October, 2016.

*The foregoing document was sworn and subscribed by me, a notary public, on this 4th day of October, 2016 by Roger Schweikert.*

*Roger R. Schweikert*

Roger Schweikert

*[signature], Notary Public*

*My commission expires: 8/31/18     Registration # 100940*

PATRICIA WADE GILLS
NOTARY PUBLIC
REG # 100940
MY COMMISSION
EXPIRES
8/31/2018
COMMONWEALTH OF VIRGINIA

45 of 55